# Illinois Official Reports

## Appellate Court

---

### *People v. Craine*, 2020 IL App (1st) 163403

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALANDIS CRAINE, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>No. 1-16-3403 |
| Filed | March 26, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-13806; the Hon. Thomas M. Davy, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and David T. Harris, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Whitney Bond, and Maria D. Lopez, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE BURKE delivered the judgment of the court, with opinion.<br>Presiding Justice Gordon and Justice Reyes concurred in the judgment and opinion. |

¶ 1 Following a bench trial, defendant, Alandis Craine, was found guilty of unlawful use of a weapon by a felon and possession of cannabis with intent to deliver, then sentenced to a term of 26 months' imprisonment. On appeal, defendant contends that the court erred in denying his motion to quash arrest and suppress evidence where the police officers lacked probable cause and exigent circumstances to enter his home and effectuate the arrest. Defendant also contends that the consent to search his home was not given voluntarily and knowingly given the inherently coercive environment. Finally, defendant contends that the State failed to prove beyond a reasonable doubt that defendant had possession of the firearm and cannabis found in the bedroom of his home. For the reasons that follow, we find that the court erred in denying defendant's motion to suppress and, accordingly, vacate defendant's convictions and sentence.

¶ 2                                                            I. BACKGROUND
¶ 3                                            A. Motion to Quash Arrest and Suppress Evidence
¶ 4 Prior to trial, defendant filed a motion to quash his arrest and suppress evidence. In the motion, defendant contended that the police officers who arrested him had no arrest warrant and that his conduct prior to his arrest was not such that would reasonably be interpreted by the arresting officers as constituting probable cause to arrest. Defendant also contended that the search of his home following his arrest was unconstitutional.

¶ 5 At the suppression hearing, Darnell Moore testified that on July 10, 2014, at 11:15 p.m., he and defendant were sitting on the porch in front of defendant's house on South Throop Street in Chicago, Illinois. Moore heard gunshots. About a minute later, a police vehicle turned onto the street. Moore noted that the police vehicle was going the wrong way on the one-way street in front of defendant's home. Moore testified that defendant was "already walking in the house" when police officers exited the vehicle in front of the house. As defendant was closing the door to the house, the police officers "ran and busted in the door." Moore testified that defendant was not running when he entered the house, was not holding his side, and did not have a gun. Moore testified that the gunshots did not originate from the street they were on and seemed to have come from a block or two away from their location.

¶ 6 On cross-examination, Moore testified that they could not see anything in the direction of the gunshots because it was dark and the streetlights were out. Moore also testified that the police vehicles were driving at a high rate of speed when they turned onto Throop Street and drove toward defendant's house. Moore testified that, before the officers even exited their vehicle, defendant was already inside his house with the door closed. Although he did not see defendant enter the house because his attention was focused on the police officers, he testified that he heard the door to the house "click" closed after he saw defendant walking through the door.

¶ 7 Defendant's grandmother, Pearlie Craine (Pearlie), testified that she was in the dining room of the house on South Throop Street when police arrested defendant. She testified that she heard a noise and then saw police officers in her living room. Pearlie testified that the officers searched the house without asking permission to conduct a search. Pearlie testified that the house did not smell like marijuana because she is asthmatic and would react to any strong odors. She further testified that there are three doors at the front entrance to the house and the

police damaged all three of them when they came into the house. She identified the damage to the doors on exhibits introduced by the defense.

¶ 8 Pearlie further testified that, after the police recovered a gun and cannabis from their search, the officers presented Pearlie with a form to sign. The officers told Pearlie she had to sign the form to acknowledge the items they were removing from the house. Pearlie testified that she did not have her glasses when she signed the form, so she could not read it. Nonetheless, Pearlie signed the document because she had a conversation with one of the officers regarding their membership in the Master Masons, a fraternal organization. Pearlie testified that she thought she could trust the officer because they were reminiscing about people they knew from the organization before she signed the form. Pearlie testified that the officers searched the entire house and only presented her with the form to sign as they were about to leave. She testified that she did not consent to any search and they did not ask her permission to search the home.

¶ 9 On cross-examination, Pearlie testified that there were several officers in her house. She also testified that, when the officer asked her to sign the consent to search form, the officer had his hand covering the "consent to search" title at the top of the document. Pearlie acknowledged that her signature was on the signature line of the form.

¶ 10 Chicago police sergeant Emmett McClendon testified that on the night of July 10, 2014, he was driving an unmarked Chicago police vehicle when he heard gunshots coming from somewhere between 78th Street and 80th Street on South Throop Street. En route to that location, Sergeant McClendon observed two individuals standing on a porch outside of a home at 7944 South Throop Street. Sergeant McClendon did not see anyone else in the area. As he drove down the street, defendant looked in McClendon's direction and then "held his right side" and tried to enter the house. Sergeant McClendon testified that defendant was "[p]lacing his right hand on his right hip as if he was trying to conceal something." Defendant then ran inside the residence. Sergeant McClendon testified that, as he pulled up in front of the house, he shouted " 'police; stop' " but defendant did not stop.

¶ 11 Sergeant McClendon believed that defendant might have a weapon on him based on the gunshots he heard fired in the vicinity. He therefore ran after defendant into the house. Defendant attempted to close the door to the house, but Sergeant McClendon was able to push through the door into the house. Sergeant McClendon testified that defendant attempted to lock the door to the house "but it didn't lock." Sergeant McClendon testified that he did not cause any damage to any of the doors while entering the house. Sergeant McClendon was able to detain defendant in the foyer between the living and dining areas of the home. Sergeant McClendon conducted a protective pat-down of defendant but did not recover any weapon. Several other officers entered the house with Sergeant McClendon.

¶ 12 Sergeant McClendon then spoke to Pearlie and informed her that he smelled cannabis inside the house. Sergeant McClendon then asked for her consent to search the home. Sergeant McClendon prepared a consent to search form and filled out the details. When he presented it to Pearlie, she asked if she could retrieve her glasses so that she could read the form. Sergeant McClendon allowed her to do so. Sergeant McClendon testified that, after putting on her glasses, Pearlie read the consent to search form "several times" and then signed it. Sergeant McClendon then asked Pearlie to direct the officers to defendant's bedroom, and she complied. Sergeant McClendon did not search the bedroom himself, but other members of the tactical team did. Sergeant McClendon stayed with Pearlie in the dining room, and they discussed their membership as Master Masons.

¶ 13    On cross-examination, Sergeant McClendon testified that, after hearing the gunshots, he drove toward Throop Street because in his experience he was "pretty good on judging the area of where the shots had come from."

¶ 14    In ruling on defendant's motion, the circuit court observed that both Sergeant McClendon and Moore testified that there were gunshots fired in the area. The court noted that the police do not have to be "100 percent certain" that a person who is making a "furtive movement" in fact has a weapon, but the court determined that, based on the totality of the circumstances, the police were justified in pulling up to the house. The court noted that there were no other individuals on the street. The court found Sergeant McClendon's testimony "to be more credible in terms of the arrival of the police and the entry of the Defendant into the home making a movement."

¶ 15    The court also found Sergeant McClendon's testimony more credible than Pearlie's with regard to the consent to search. The court noted that Pearlie testified that she was "practically blind" without her glasses but was able to sign "very clearly and very accurately" on the consent to search form. Accordingly, the court denied defendant's motion to quash arrest and suppress evidence.

¶ 16                                                    B. Trial

¶ 17    At trial, Chicago police officer Luis Escobedo testified that on July 14, 2014, he and his partner were en route to a burglary on 79th and Justine Streets when he heard two gunshots. Officer Escobedo heard a radio call from Sergeant McClendon, who was already on the scene of the burglary, that he also heard the two gunshots. Officer Escobedo and his partner went to the area where they believed the gunshots had been fired. Officer Escobedo spoke to two individuals who indicated that the gunshots came from South Throop Street. On his way to that location, Officer Escobedo received another radio call from Sergeant McClendon, who indicated that an individual ran into a house on South Throop Street. When Officer Escobedo arrived at that location, he observed three other police vehicles and Sergeant McClendon standing in the entryway of the house with defendant in custody.

¶ 18    He and Sergeant McClendon entered the house, and Officer Escobedo noted that the house had a strong odor of cannabis. Officer Escobedo and Sergeant McClendon had a conversation with Pearlie, and she signed the consent to search form. The officers were then directed to defendant's bedroom in the house, which Officer Escobedo searched along with other officers. Officer Escobedo recovered two large bags containing cannabis from underneath a desk that was in the room. Officer Escobedo also recovered a .38 revolver handgun that was inside the desk drawer. Under defendant's bed, Officer Escobedo recovered cash and a bag containing 12 rounds of assorted ammunition. Officer Escobedo also recovered "two proofs of residency" from the desk. One of the proofs of residency was a bank statement in defendant's name at the subject address, and the other was an unopened piece of mail from the National Rifle Association (NRA) addressed to defendant at the subject address. The unopened piece of mail was opened in court and contained a renewal statement for NRA membership.

¶ 19    The following day, Officer Escobedo and Sergeant McClendon had a conversation with defendant, in which defendant stated that he was aware of the presence of the revolver and had it for protection but indicated that it was not loaded. Defendant also told the officers that he sold marijuana to "help out" his mother.

- 4 -

¶ 20    The State entered a certified copy of defendant's 2006 conviction for possession of narcotics with intent to deliver.

¶ 21    Following closing argument, the circuit court recounted Officer Escobedo's testimony and noted that the cannabis and revolver were found in defendant's room near his proof of residency. Defendant also made inculpatory statements to the officers regarding the cannabis and revolver. The court therefore found that the State had proved defendant guilty beyond a reasonable doubt with regard to one charge of unlawful use of a weapon by a felon as to the handgun. On the charge of unlawful use of a weapon by a felon based on the ammunition, the court found that defendant was not guilty because defendant's only statement was that the revolver was unloaded. The court also found defendant guilty of possession of cannabis with intent to deliver based on defendant's statement to officers and the amount of the cannabis, as well as its packaging in zip-top bags. At a subsequent sentencing hearing, the court sentenced defendant to a term of imprisonment of 26 months. This appeal follows.

¶ 22                                II. ANALYSIS

¶ 23    On appeal, defendant contends that the court erred in denying his motion to quash arrest and suppress evidence where the police lacked probable cause to reasonably believe that he had committed or was committing a crime. Defendant contends that, even if the officers had probable cause to reasonably suspect that he had committed a crime, the officers lacked exigent circumstances warranting entry into his home to effectuate the arrest. Defendant further contends that, after the officers entered the home, the environment inside the home was coercive such that no meaningful consent to search could be granted. Defendant asserts that, by forcibly entering the home in a large number, the officers created an inherently coercive environment such that Pearlie's consent to search could not have been voluntarily or knowingly granted. Finally, defendant contends that the State failed to prove beyond a reasonable doubt that he had possession of the revolver and cannabis found in the bedroom.

¶ 24                             A. Motion to Suppress

¶ 25    Defendant first argues that the court erred in denying his motion to quash his arrest and suppress evidence because the police lacked probable cause to believe that he had committed or was committing a crime and, thus, had no lawful right to enter his home. Defendant asserts that Sergeant McClendon's observations were insufficient to establish probable cause and defendant's conduct would not have led a reasonable officer to believe that defendant had committed a crime. Defendant further contends that, even if the officers had probable cause to arrest, they lacked exigent circumstances to enter his home without a warrant.

¶ 26                            B. Standard of Review

¶ 27    In reviewing a trial court's ruling on a motion to suppress evidence, we apply a two-part standard of review. See *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). We will reverse the trial court's factual findings only if they are against the manifest weight of the evidence, but we review *de novo* the trial court's ultimate ruling as to whether suppression is warranted. *People v. Williams*, 2016 IL App (1st) 132615, ¶ 32. The defendant, not the State, bears the burden of proof on a motion to suppress. See, *e.g.*, *People v. Cregan*, 2014 IL 113600, ¶ 23. At a hearing on a motion to suppress evidence, the trial court is responsible for determining the credibility of the witnesses, weighing the evidence, and drawing reasonable inferences therefrom.

*Williams*, 2016 IL App (1st) 132615, ¶ 32 (citing *People v. Ballard*, 206 Ill. 2d 151, 162 (2002)).

¶ 28                                    C. Probable Cause

¶ 29        "Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime." *People v. Grant*, 2013 IL 112734, ¶ 11 (citing *People v. Wear*, 229 Ill. 2d 545, 563-64 (2008)); see also *In re Edgar C.*, 2014 IL App (1st) 141703, ¶ 110 (there is probable cause "where the facts and circumstances known to the arresting officer at the time of the arrest would lead a reasonable person to believe that a crime had occurred and the suspect had committed it"). The existence of probable cause is an objective determination that must be made on a case-by-case basis and depends upon the totality of the circumstances at the time of the arrest. *Grant*, 2013 IL 112734, ¶ 11 (citing *Wear*, 229 Ill. 2d at 564). "[W]hether probable cause exists is governed by commonsense considerations, and the calculation concerns the probability of criminal activity, rather than proof beyond a reasonable doubt." *People v. Hopkins*, 235 Ill. 2d 453, 472 (2009).

¶ 30        Here, we find that the record does not support a finding that the officers had probable cause to enter defendant's home and arrest him. As noted, we will defer to the trial court's factual findings at the hearing on the motion to suppress. In this case, the court indicated that it found Sergeant McClendon's testimony to be more credible than the testimony of Moore and Pearlie. Indeed, in ruling on defendant's motion for a new trial, the court indicated that it did not find Moore's testimony to be at all credible. Nonetheless, even accepting Sergeant McClendon's testimony regarding the circumstances leading up to defendant's arrest, the record still shows that the officers lacked probable cause to enter his home.

¶ 31        At the suppression hearing, Sergeant McClendon testified that he was driving an unmarked police vehicle when he heard gunshots. Sergeant McClendon began driving toward the area where he believed the gunshots came from when he observed defendant and Moore standing on a porch outside defendant's home. Sergeant McClendon testified that defendant looked in McClendon's direction and then "held his right side" and tried to enter the house. Sergeant McClendon testified that defendant was "[p]lacing his right hand on his right hip as if he was trying to conceal something." Sergeant McClendon thought defendant *might* have a gun on him and thus ran after defendant into the house. Defendant attempted to close the door to the house, but Sergeant McClendon was able to push through the door and detain defendant inside the house. Sergeant McClendon conducted a protective pat-down of defendant but did not recover a firearm.

¶ 32        Thus, the facts known to Sergeant McClendon at the time of defendant's arrest were that gunshots had been fired in the vicinity, defendant and Moore were standing on a porch near where Sergeant McClendon believed the gunshots emanated from (although defendant was not on the exact block Sergeant McClendon indicated), defendant ran into his home upon seeing Sergeant McClendon in his unmarked police vehicle, and defendant was holding his right hip "as if he was trying to conceal something." We find that, based on the circumstances of this case, these facts and circumstances were insufficient to suggest that defendant had committed or was committing a crime and thus that probable cause to arrest existed. Significantly, Sergeant McClendon had no indication that defendant was in any way involved with the gunshots he heard. Sergeant McClendon's testimony shows that he observed defendant and

Moore moments after hearing the gunshots. He also acknowledged that defendant was at least a block or two away from where Sergeant McClendon believed the shots occurred. He did not see a gun in defendant's hand or have any indication that defendant had recently fired gunshots. As noted, in order for probable cause to exist, the officer must reasonably believe that a crime occurred *and that the defendant committed it*. *People v. Clay*, 349 Ill. App. 3d 24, 29 (2004). Although defendant was present in the area, it is well settled that an individual's presence in an area of expected criminal activity, standing alone, is insufficient to establish probable cause. *People v. Sims*, 192 Ill. 2d 592, 616-17 (2000). We acknowledge that defendant's presence in the area may be considered a *factor* in establishing probable cause (*id.* at 617), but we find that the other circumstances known to Sergeant McClendon at the time were insufficient to establish probable cause.

¶ 33        As for defendant's "flight" upon observing Sergeant McClendon in his unmarked police vehicle, as discussed in more detail below, this court has consistently held that running from police is not sufficient to establish even the reasonable suspicion necessary to effectuate an investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968), absent other circumstances indicating illegal behavior. See, *e.g.*, *In re D.L.*, 2017 IL App (1st) 171764, ¶ 29 (no reasonable suspicion where, "aside from [respondent's] flight, there was no testimony showing that respondent was acting suspiciously in any way"); *People v. Harris*, 2011 IL App (1st) 103382, ¶ 15 (evidence of flight, "[g]iven the dearth of contextual evidence" suggesting any other criminal activity, was insufficient to justify *Terry* stop). Thus, where flight alone is insufficient to meet even this lower standard necessary for the *Terry* investigatory stop, it is clear that it would not be sufficient to establish probable cause to arrest. *In re D.W.*, 341 Ill. App. 3d 517, 526 (2003). Accordingly, because we find that the circumstances were such that an officer would not reasonably believe that defendant had committed or was committing a crime, defendant's flight cannot be the basis for the officers to chase defendant into his house and arrest him. As such, we find that the trial court erred in denying defendant's motion to suppress where the officers did not have probable cause to arrest him.

¶ 34                                    D. Reasonable Suspicion

¶ 35        The State contends, however, for the first time on appeal that, when Sergeant McClendon first observed defendant, he attempted to conduct a *Terry* stop by shouting "police; stop." The State asserts that defendant's actions then gave rise to probable cause for an arrest when defendant ignored the lawful request to stop and instead fled into the house holding his right hip.

¶ 36        As noted, because the State did not raise this theory in the trial court, there is no testimony from Sergeant McClendon regarding his attempts to effectuate a *Terry* stop, nor is there a finding from the trial court that defendant's behavior prior to his flight was such that Sergeant McClendon had a reasonable, articulable suspicion that defendant had committed or was about to commit a crime.[1] See *People v. Timmsen*, 2016 IL 118181, ¶ 9. The only suggestion in the record that Sergeant McClendon attempted to conduct an investigatory stop of defendant was

---

[1]We acknowledge that the "principle of waiver applies to the State as well as the defendant in a criminal case." *People v. O'Neal*, 104 Ill. 2d 399, 407 (1984). Nonetheless, we will address the State's newly raised contention because there is ample evidence in the record to address the State's claims and because our ruling is not altered by our resolution of this contention.

- 7 -

his testimony that, when he pulled up in front of defendant's house, he shouted "police; stop." Nonetheless, the State contends that the evidence adduced at the suppression hearing demonstrates Sergeant McClendon had reasonable suspicion to believe defendant was involved in the commission of a crime based on the fact that Sergeant McClendon heard gunshots in the area and also considering the time of day, the number of people in the area, the character of the neighborhood, defendant's flight, and his furtive movements. The State asserts that this reasonable suspicion evolved into probable cause to arrest when defendant fled from the officers rather than complying with the lawful order to stop.

¶ 37                                  1. Terry *Investigatory Stops*

¶ 38        "Pursuant to *Terry*, a police officer may conduct a brief, investigatory stop of a person where the officer reasonably believes that the person has committed, or is about to commit, a crime." *Id.* (citing *Terry*, 392 U.S. at 22). To justify an investigative stop, a police officer must identify specific and articulable facts that, when taken together with natural inferences, reasonably warrant the intrusion. *Id.* Although this standard is less demanding than that required for probable cause, an officer's suspicion must be based on more than a " 'hunch' " or " 'unparticularized suspicion.' " (Internal quotation marks omitted.) *Id.* (quoting *Terry*, 392 U.S. at 27). In addition, the investigatory stop must be justified at its inception, which recognizes an individual's right to avoid an encounter with police in the absence of reasonable suspicion. *Id.* ¶¶ 9-10. " '[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business.' " *Id.* ¶ 10 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).

¶ 39        Here, the record does not support the State's contentions that Sergeant McClendon even attempted to conduct a valid investigatory stop or that defendant fled in response to Sergeant McClendon's attempts to effectuate a *Terry* stop, so as to provide the officers with probable cause to enter his home and arrest him. The State repeatedly suggests that defendant's flight was "unprovoked" and that defendant ignored Sergeant McClendon's shouts to "stop." Neither of these contentions are borne out by the record. At the suppression hearing, Sergeant McClendon testified that he shouted "police; stop" only when he initially pulled up in front of the house. However, his testimony makes it unclear where defendant was at the time Sergeant McClendon shouted. Sergeant McClendon testified that defendant held his right hip and ran into the house as soon as he looked in Sergeant McClendon's direction. Sergeant McClendon testified that defendant looked in his direction while he was still driving his unmarked police vehicle and was a few houses away from defendant's house. Defendant was standing on the porch to his home at the time he observed Sergeant McClendon in his police vehicle. Thus, by the time Sergeant McClendon attempted to effectuate the alleged investigatory stop, defendant's "unprovoked" flight had already begun, and it is unclear whether defendant was already inside the home before Sergeant McClendon shouted at him to "stop." This distinction is important because, once defendant was inside his home, the officers had no ability to conduct a *Terry* stop. See 725 ILCS 5/107-14 (West 2014) ("A peace officer, after having identified himself as a peace officer, may stop any person in a *public place* for a reasonable period of time ***." (Emphasis added.));[2] see also *Wear*, 229 Ill. 2d at 567 (the officer's "entry into the

_____

[2]Section 107-14 of the Code of Criminal Procedure of 1963 codifies the principles of *Terry*. *Timmsen*, 2016 IL 118181, ¶ 9 n.7.

residence to merely conduct an investigatory *Terry* stop would have violated the fourth amendment"). Again, the State's failure to raise this argument before the trial court clouds the record on this issue. Nonetheless, the chronology as laid out in Sergeant McClendon's testimony suggests that defendant began to flee inside his home before Sergeant McClendon shouted "stop" and, thus, before Sergeant McClendon attempted to effectuate an investigatory stop. As noted, before Sergeant McClendon attempted to effectuate the investigatory stop, defendant had the right to go about his business. *Timmsen*, 2016 IL 118181, ¶ 10.

¶ 40    In addition, the State's assertion that defendant's flight was "unprovoked" is disingenuous. Like Sergeant McClendon, defendant also heard gunshots in the area. As the evidence demonstrates, defendant was not involved in the shooting.[3] Moments after hearing nearby gunshots, defendant observed an unmarked vehicle turn onto his block, driving the wrong way on a one-way street in the direction of his house. Moore testified that the vehicle was driving at a high rate of speed. It would be reasonable under these circumstances for defendant to retreat into his home.

¶ 41    We find the State's reliance on *People v. Johnson*, 408 Ill. App. 3d 107 (2010), unpersuasive. In *Johnson*, two officers were on patrol in an unmarked police vehicle in a "high-crime area targeted for aggressive patrol." *Id.* at 109. The officers conducted a traffic stop of a vehicle after it failed to come to a complete stop at a stop sign. *Id.* Aside from the traffic violation, the officers did not see the two occupants of the vehicle break any laws. *Id.* As the officers approached the vehicle, defendant, who was seated in the passenger seat, exited the vehicle and started running. *Id.* The officers detained defendant less than a block away and handcuffed him. *Id.* The officers then conducted a protective pat-down of defendant, which revealed defendant had a gun in his waistband. *Id.* At the hearing on defendant's motion to suppress, one of the officers testified that defendant was not under arrest when the officers handcuffed him and conducted the protective pat-down but was only placed under arrest after the discovery of the gun. *Id.* at 110. The trial court granted defendant's motion to suppress, finding that the circumstances warranted a protective pat-down of defendant, but the court found that, when the officers handcuffed defendant prior to the pat-down, he had been arrested without probable cause. *Id.* at 110-11.

¶ 42    On appeal, this court found that the officers had the requisite reasonable suspicion to detain defendant for a *Terry* investigatory stop because the stop took place in a high-crime area and defendant fled from the police officers when the officers approached the stopped vehicle. *Id.* at 112. The court recognized, however, that flight from police is insufficient to establish probable cause when an officer approaches a person to make a *Terry* stop without the requisite reasonable suspicion to make the investigatory stop. *Id.* at 122. The court found, however, that defendant was lawfully detained when the vehicle in which he was a passenger was stopped. *Id.* At the time the officers stopped the vehicle for a traffic violation, "the officers had probable cause to believe that the driver had committed a traffic infraction and, therefore, lawfully seized both the driver and passenger of that vehicle." *Id.* The court then determined that, because the seizure was lawful from its inception, defendant's attempt to evade the police officers in

---

[3]Sergeant McClendon testified that he detained defendant moments after observing him and did not recover a firearm when he searched him. He also did not recover a firearm from the vicinity and acknowledged that defendant did not have time to discard a firearm before Sergeant McClendon apprehended him.

running from the vehicle gave the officers probable cause to arrest him for obstructing an authorized action by a peace officer. *Id.* Accordingly, the court reversed the trial court's ruling on defendant's motion to suppress. *Id.* at 126.

¶ 43    In contrast to *Johnson*, in this case, as discussed, defendant's "seizure" was not lawful from its inception. As noted, the facts presented at the suppression hearing demonstrated that defendant was not acting in such a way that the officers would have a reasonable suspicion to conduct a *Terry* investigatory stop. Moreover, the *Johnson* court determined that, because of the traffic stop, the defendant was "seized" prior to his flight. Once the defendant in *Johnson* fled from that lawful detention, the officers then had probable cause to arrest him. Here, as discussed, the evidence shows that defendant was already in the process of fleeing or had already fled *prior* to any detention. Defendant was thus not "seized" prior to his flight, and his flight could not give rise to any violations of the Criminal Code of 2012 (720 ILCS 5/1-1 *et seq.* (West 2014)). Accordingly, we find the circumstances of *Johnson* distinguishable from the case at bar.

¶ 44    Rather, we find this court's decision in *In re D.L.*, 2017 IL App (1st) 171764, instructive. In *D.L.*, officers responded to a call of shots fired but were not given information about the identity of the suspects. *Id.* ¶ 4. En route to the location indicated, the officers observed two individuals " 'walking quickly' " away from the area of the shots-fired call. *Id.* ¶ 5. There were no other people in the area. *Id.* One of the officers testified that he attempted to conduct a " 'street stop' " of the two individuals " '[to] have a conversation about the shot[s] fired call and if they heard anything.' " *Id.* The officers approached and told the respondent and the other individual to stop so that they could have a conversation about the shots fired call. *Id.* ¶ 6. The individual walking with the respondent complied and walked over to the police vehicle, but the respondent ran. *Id.* One of the officers chased after the respondent and detained him. *Id.* The officer conducted a pat-down of the respondent, recovered a handgun, and placed the respondent under arrest. *Id.* ¶¶ 7-8.

¶ 45    The circuit court granted the respondent's motion to quash arrest and suppress evidence, finding that the only information the officers had with regard to the shots fired call was the location. *Id.* ¶ 12. The court noted that the officers did not have a description of the individual or individuals involved. *Id.* The court found that the only information the officers had at the time they attempted to conduct the *Terry* stop was that the respondent was walking quickly away from an area where shots had been fired. *Id.*

¶ 46    On appeal, the State implicitly conceded that the officers did not have a legitimate basis to conduct an investigatory stop of the respondent at the time they initially ordered him to stop but asserted that respondent was only seized under the fourth amendment when the officer detained him after chasing him. *Id.* ¶¶ 20-21. This court accepted the State's concession, finding that the stop of the respondent was not justified from its inception because, although the respondent was walking away from the area of the shots-fired call, the officer's testimony demonstrated that the respondent was not on the exact street the call indicated. *Id.* ¶ 21. Similarly, the court found that "most people would be inclined to make a quick departure from the scene of gunfire, and accordingly, such behavior would not be unusual." *Id.* The court also rejected the State's contention that the respondent's flight justified the stop, finding that flight alone was insufficient to establish reasonable suspicion that a person has committed, or is about to commit, a crime. *Id.* ¶ 28 (citing *People v. Hyland*, 2012 IL App (1st) 110966, ¶ 32). The court noted that reasonable suspicion justifying a *Terry* stop only arises when flight is coupled

with other factors that may support reasonable suspicion. *Id.* The court found that no such other factors existed in that case where the testimony did not show that the respondent was acting suspiciously in any way. *Id.* ¶ 29.

¶ 47 Here, too, the testimony does not show that defendant was acting suspiciously in any way such that Sergeant McClendon would be justified in attempting to conduct a *Terry* investigatory stop of defendant. Like the respondent in *D.L.*, defendant was near the area where Sergeant McClendon believed there were gunshots. However, also like the respondent in *D.L.*, defendant was not on the precise street where Sergeant McClendon testified he believed the shots originated. Likewise, defendant was not acting suspiciously in any way while standing on his porch. Thus, defendant's flight could not give rise to reasonable suspicion justifying a *Terry* stop, even if defendant's flight was accompanied by him grabbing his right side as if to conceal something, because this action by defendant was not sufficient to establish reasonable suspicion that he has committed, or was about to commit, a crime. *Id.* ¶ 28. As discussed above, defendant's flight could not be considered unusual because "most people would be inclined to make a quick departure from the scene of gunfire" (*id.* ¶ 21), particularly after witnessing an unmarked vehicle drive toward them traveling the wrong direction on a one-way street. Accordingly, we find that Sergeant McClendon did not have a reasonable suspicion to justify stopping defendant either before or after his flight into his home and, thus, the officers did not have probable cause to enter defendant's home and arrest him.

¶ 48                                              E. Probable Cause

¶ 49 Even assuming Sergeant McClendon had the reasonable suspicion necessary to conduct a *Terry* stop of defendant prior to defendant's flight, we find that defendant's retreat into his residence did not constitute probable cause such that Sergeant McClendon was justified in effectuating a warrantless entry into defendant's home. We find this court's decision in *In re D.W.* instructive. See *In re D.W.*, 341 Ill. App. 3d at 526.

¶ 50 In *D.W.*, a police officer received information that someone was selling drugs at a particular building. *Id.* at 520. The officer proceeded to the building and observed a subject matching the description standing outside with a group of people. *Id.* The officer approached the building and indicated to the defendant that he needed to speak with him. *Id.* In response, the defendant turned and fled into the building. *Id.* The officer and his partner chased after the defendant into an apartment unit. *Id.* The arresting officer testified that the door of the apartment was " 'slightly ajar.' " *Id.* Upon entering the apartment, the officer observed the defendant removing a large plastic bag from his jacket and attempting to conceal it. *Id.* at 520-21. The officer believed the plastic bag contained cocaine. *Id.* at 521. The officer detained the defendant, and his partner recovered the cocaine. *Id.* The trial court denied the defendant's motion to suppress, finding that the officers did not have " 'true' " probable cause when they arrived on the scene but that the officers had probable cause once the defendant fled. *Id.*

¶ 51 On appeal, this court reversed the trial court's ruling on the motion to suppress, rejecting the argument that the defendant's flight into his home justified the officers' warrantless entry. *Id.* at 525-26. The court found it "significant" that the defendant fled into his home and that although the defendant's flight gave the officers a reason to stop the defendant and investigate his suspicious actions, it did not give the officers probable cause to arrest. *Id.* at 526. The court noted that, in order to enter the defendant's home to arrest him without a warrant, the officers needed both probable cause and exigent circumstances. *Id.* The court determined that, under

the circumstances of the case, neither requirement was met and, thus, the trial court erred in denying the defendant's motion to suppress. *Id.* at 526-30.

¶ 52    Here, as in *D.W.*, we find that, even assuming Sergeant McClendon had the reasonable suspicion necessary to effectuate a *Terry* investigatory stop of defendant, defendant's flight into his home did not transform Sergeant McClendon's reasonable suspicion into probable cause. See *id.* at 524-26. As such, Sergeant McClendon was not justified in entering defendant's home to effectuate the arrest. We therefore find it unnecessary to address whether exigent circumstances existed meriting the officers' entry into the home because, as noted, in order for police officers to make a warrantless entry into a suspect's home to effectuate an arrest, the officers need *both* probable cause and exigent circumstances. See *Wear*, 229 Ill. 2d at 562.[4] Because we find that the officers lacked probable cause in this case, we need not address whether exigent circumstances existed.

¶ 53    We observe that, in his reply brief and during oral argument, the defendant cited *People v. Horton*, 2019 IL App (1st) 142019-B, a recent decision from another division of this court. Although the majority in *Horton* reached a similar conclusion in a case with a similar factual pattern, we would distinguish that case based on a few important distinctions and note that we are not following the reasoning or precedent of *Horton*. First, the officer in *Horton* testified that he observed a " 'metallic object' " in Horton's waistband. *Id.* ¶ 15. The officer in *Horton* described the object as " 'chrome,' " and he believed it was a weapon. *Id.* ¶ 17. The officer testified at trial that he believed the " 'chrome metallic object' " was the butt of a handgun. *Id.* ¶ 26. In this case, in contrast, Sergeant McClendon merely testified that he saw defendant grab his hip as he entered his residence but did not see any evidence of a weapon. The officer in *Horton* also testified that he observed a " 'bulge' " on the defendant's side that had the " 'characteristics of a weapon.' " *Id.* Again, in this case, Sergeant McClendon did not testify that he observed a bulge. Accordingly, the officer in *Horton* gave a specific and detailed description of an object that he believed to be a handgun, an element that is missing in this case. Under the circumstances of *Horton*, we would find that the officer's conduct in that case was supported by the constitution. These specific details regarding the defendant's possession of a weapon, however, are absent in this case. As such, we find that the majority's reasoning in *Horton* is not applicable to the case at bar.

¶ 54                                F. The Subsequent Search

¶ 55    Having concluded that the police were not justified in detaining defendant, we must also conclude that the subsequent search was not justified. *D.L.*, 2017 IL App (1st) 171764, ¶ 31. In so concluding, we consider "whether the evidence was obtained 'by means sufficiently distinguishable to be purged of the primary taint' of illegality." *People v. Lovejoy*, 235 Ill. 2d 97, 130 (2009) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). Even though

---

[4]We note that, in its brief, the State indicates that it "disagree[s]" that officers need both probable cause and exigent circumstances in order to enter a home for a warrantless arrest. The supreme court's pronouncement in *Wear* is clear, however, that entry into a home to effectuate an arrest is " 'simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, *even when it is accomplished under statutory authority and when probable cause is clearly present*.' " (Emphasis added and internal quotation marks omitted.) *Wear*, 229 Ill. 2d at 562 (quoting *Payton v. New York*, 445 U.S. 573, 588-89 (1980)).

the court found that Pearlie's consent to the subsequent search was valid, an illegal detention may taint the subsequent consent to search. See *People v. Brownlee*, 186 Ill. 2d 501, 521 (1999). Here, the State did not argue that the evidence against the defendant should not have been suppressed as the fruit of the officers' illegal detention in their brief, and therefore, we could consider the issue waived. See *id.* The State raised the issue, however, during oral argument, contending that the consent to search was sufficiently attenuated from the arrest such that the evidence obtained from the search should not be suppressed even in the absence of probable cause. Although we could decline to address this argument and correctly find that the State has forfeited it (*People v. Thomas*, 164 Ill. 2d 410, 422 (1995); Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued are forfeited and shall not be raised in the reply brief, *in oral argument*, or on petition for rehearing." (Emphasis added.))), we will nonetheless address the merits of the contention because it does not alter our judgment.

¶ 56    The attenuation doctrine allows for the admission of evidence when the connection between the unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstances, so that " 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.' " (Internal quotation marks omitted.) *In re Jarrell C.*, 2017 IL App (1st) 170932, ¶ 24 (quoting *Utah v. Strieff*, 579 U.S. ___, ___, 136 S. Ct. 2056, 2061 (2016)). Courts examine three factors in determining whether the discovery of the evidence is sufficiently attenuated from unconstitutional conduct. *In re K.M.*, 2019 IL App (1st) 172322, ¶ 37 (citing *Brown v. Illinois*, 422 U.S. 590 (1975)). The three factors are the " 'temporal proximity' " between the unconstitutional conduct and the discovery of the evidence, the presence of " 'intervening circumstances,' " and the " 'purpose and flagrancy of the official misconduct.' " *Id.* (quoting *Brown*, 422 U.S. at 603-04).

¶ 57    Here, the State contends that Pearlie's voluntary signature on the consent to search form was an intervening circumstance, which severed the causal chain between the illegal entry and detention and the recovery of the evidence. " 'An intervening circumstance is one that dissipates the taint of unconstitutional police conduct by breaking the causal connection between the illegal conduct and the [evidence].' " *Id.* ¶ 42 (quoting *People v. Wilberton*, 348 Ill. App. 3d 82, 86 (2004)). Here, the only reason the police officers were in the house was to effectuate the illegal arrest and search of defendant. Only after the illegal entry into the house did the officers smell the cannabis that they testified prompted them to present Pearlie with the consent to search form. The officers thus never broke the causal connection between the illegal entry and detention and the recovery of the evidence from defendant's room. *Id.* ¶ 43. "The officers never left [defendant's] property, which demonstrates that the taint of the unconstitutional conduct was ongoing at the time the police" presented Pearlie with the consent to search and conducted the search of the home. *Id.* We conclude that there was therefore no independent intervening event that broke the casual chain between the illegal entry and detention and the recovery of the evidence.

¶ 58    We note that the other factors, temporal proximity and purpose and flagrancy of the police misconduct, would also weigh in favor of suppression. The search occurred only minutes after defendant was illegally detained and searched, and as discussed above, the officers illegally entered defendant's home without a warrant or an exception to the search warrant requirement. See *id.* ¶¶ 42-45.

¶ 59    Having found that the fruits of the officers' search must be suppressed, the State would not be able to convict defendant on remand. *People v. Lopez*, 2018 IL App (1st) 153331, ¶ 38. As a result, we reverse his conviction. *Id.* Because we reverse defendant's conviction on this basis, we need not reach his remaining arguments.

¶ 60                                    III. CONCLUSION

¶ 61    For the reasons stated, we reverse the judgment of the circuit court of Cook County and vacate defendant's convictions and sentence.

¶ 62    Reversed.