2022 IL App (1st) 1182605-U

FIFTH DIVISION
November 18, 2022

No. 1-18-2605

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of Cook County. |
| | ) | |
| v. | ) | 11 CR 00909 |
| | ) | |
| JEREMY BORDERS, | ) | Honorable Evelyn B. Clay and |
| | ) | Honorable Angela Munari Petrone, |
| | ) | Judges Presiding. |
| Defendant-Appellant. | ) | |

PRESIDING JUSTICE CONNORS delivered the judgment of the court.
Justice Delort concurred in the judgment.
Justice Mitchell specially concurred in the judgment.

**ORDER**

¶ 1    *Held:* Trial court erred when it denied defendant's motions to quash arrest and suppress evidence where there was no probable cause to arrest him; reversed and remanded with directions.

¶ 2    Following a jury trial, defendant, Jeremy Borders, was found guilty of first degree murder (720 ILCS 5/9-1(a)(3) (West 2010)) and sentenced to 55 years in prison. Before trial, Borders filed a motion to quash arrest and suppress evidence in which he argued that he was arrested without an arrest warrant and probable cause and requested that the court suppress the

direct and indirect products of his arrest. The court denied Borders's motion to quash arrest and suppress evidence. Borders now appeals that ruling. For the following reasons, we reverse and remand with directions.

¶ 3                                    I. BACKGROUND

¶ 4        Borders and co-defendants, Keith Watts and Darnell Stokes, were charged with numerous counts of first degree murder (720 ILCS 5/9-1(a) (West 2010)), aggravated kidnapping (720 ILCS 5/10-2(a)(1-3), (6) (West 2010)), and burglary (720 ILCS 5/19-1(a) (West 2010)), among other charges, relating to the killing and kidnapping of Francisco Favela, and the aggravated kidnapping (720 ILCS 5/10-2(a)(3), (6) (West 2010)) and aggravated battery (720 ILCS 5/12-4(b)(1) (West 2010)) of David Robles that occurred on December 11, 2010.[1]

¶ 5                    Motion to Quash Arrest and Suppress Evidence

¶ 6        In Borders's written motion to quash arrest and suppress evidence, he argued he was arrested on December 13, 2010, without a valid search or arrest warrant and without probable cause. He asserted that his arrest violated the fourth amendment and requested that the court quash his arrest and suppress physical evidence, his statements, and identifications of him, which were a result of his detention and arrest. The trial court held a hearing on Borders's motion to quash arrest and suppress evidence, where the following evidence was presented.[2]

¶ 7        Borders testified that on December 13, 2010, at about 8 p.m., he was handcuffed and arrested by detectives from the Chicago Police Department (CPD) at his second floor apartment at 503 North LeClaire in Chicago. To get into his apartment, there was an outside security gate, a main front door, and then a second door that led to a stairwell. A tenant must open the doors, and

---

[1] Border's codefendants, Watts and Stokes, are not parties to this appeal. Watts had a separate trial and Stokes passed away before his case was resolved.
[2] The judge presiding at the hearing was not the same judge who presided over Borders's subsequent trial.

Borders did not let the CPD or anyone else inside the gate or doors. Borders did not open the door to his unit or give consent to the CPD or anyone else to enter or search his apartment.

¶ 8       On cross-examination, Borders testified he was friends with Watts but not with Stokes. On the date of his arrest, his phone number was (312) 287-5361, and when the police came into his apartment, Borders was sitting on a couch by himself. Asked whether the phone with the 312 area code "was right next to you on the floor," he responded, "[i]t was *** that phone was there, but it wasn't next to me, but it was there. It was there." The State then asked him, "When you say the phone was there, where do you mean, Mr. Borders[?]" He responded, "What I mean is I doesn't—I don't remember." Asked whether there was duct tape in his apartment or a piece of paper directing Watts to take control of a car belonging to Hassan Borders, who was his uncle, Borders testified he did not remember.

¶ 9       Chicago police detective Greg Swiderek testified for the State that on December 11, 2010, Chicago police sergeant Gusman told him that Favela and Robles were rehabbing a building at 2237 South Keeler when two men entered. Swiderek testified that Robles told Gusman that Robles was struck with a gun, tied up with duct tape, and put in a bathtub. Robles believed Favela had been beaten based on the sounds he heard. Eventually, Robles did not hear anything and was able to free himself, after which he contacted the police. Swiderek testified that some officers went to the location of the kidnapping to determine if it was a "*bona fide* kidnapping," and those officers told Swiderek that there was "quite a lot of blood." At that time, the police did not have any information about Favela's location.

¶ 10       Swiderek testified that the police conducted a "mudds and tolls" search on Favela's phone, which was a record of incoming and outgoing phone calls. He testified that Favela's phone records were important because Robles had informed the police that "prior to the

kidnapping Mr. Favela had received two phone calls from a male black who was interested in renting the property, said he was interested in renting the property at 2237 South Keeler." The police determined that the last cell phone tower Favela's phone was "hitting off of" was at 3529 West Potomac in Chicago. The officers conducted a grid search of that area but did not find Favela.

¶ 11 Favela's wife received a ransom call from two men wanting $500,000 in two hours for the safe return of Favela. The phone number that made the ransom call to Favela's wife had a 219 area code (219 phone). In response to the question, "What city do you know that area code to be associated with?" Swiderek responded Hammond, Indiana. Chicago police detective Donald Hill obtained the phone records and location of the 219 phone from the phone's carrier due to "exigent circumstances." The CPD and Federal Bureau of Investigation (FBI) investigated a "series of patterns involving different phones." Asked about whether a "pattern" was noted about the 219 phone as it related to Favela's phone, Swiderek testified that "calls were made from that 219 prefix phone, cell phone, to Mr. Favela's phone and to a 773 phone number that I believed ended in maybe 1994." The person using the 219 phone used *67 to block the number so it would not show up on Favela's phone. A mudds and tolls search allowed the police to see the number even though it was blocked. The FBI determined the location of the 219 phone by "pinging it off the cell tower that the cell phone was hitting off of," and in the early morning hours of December 12, 2010, the 219 phone was pinging at a location in Hammond, Indiana. The police went to that address and found Stokes, who was with his nephew, Derrick Stidwell, in the front of the residence with the 219 phone in his possession. Stokes was arrested and taken to the police station with Stidwell. Stidwell informed the police that Stokes had picked him up and they drove to Hammond, Indiana. On the way, Stokes threw a set of keys and his shoes out of the car

window, which were eventually recovered on the shoulder of the Dan Ryan Expressway. He also testified that Stidwell informed the police that Stokes also threw out of the window "the back of a battery from a cell phone." When they arrived at Stokes's residence in Hammond, Stokes put his clothes in a plastic bag and set them on fire in the backyard.

¶ 12      Swiderek testified that the second phone in the "phone pattern" with the 773 area code (773 phone) "came back" to Watts. He testified that "The 219 or Mr. Stokes'[s] phone would call the victim's phone and then call—I don't remember the exact order, but then call Mr. Watts'[s] phone or Mr. Watts would then call Mr. Stokes after the victim was spoken with." Asked whether "So there would be phone calls inbetween [*sic*] Stokes'[s] phone, Watts'[s] phone, and the victim's phone, correct?" Swiderek responded, "Correct." The 773 phone was "pinging" in the area of 3336 West 19th Street in Chicago, and the police went to that address and arrested Watts, who had the 773 phone in his possession. The police also found clothes in the washing machine that had blood stains on them. In a duffel bag, the police found two semi-automatic pistols and bloody duct tape and clothing, which were evidence of a kidnapping. The next day, or later that day, pursuant to a search warrant for Watts's apartment, the police found a rental receipt with Favela's name on it.

¶ 13      Swiderek further testified that around 7:30 p.m. on December 13, 2010, the FBI developed a "third phone" number with a 312 area code (312 phone) in "this phone pattern between Stokes'[s] phone and Watts'[s] phone." Asked whether "in addition to this phone itself, being in a pattern with Stokes'[s] phone and Watts'[s] phone, had the FBI through the use of the technology on the phone ascertained the location of that phone at the time of the kidnapping of Mr. Favela?" Swiderek responded, "Yes, they said it was in the vicinity of the kidnapping, at the time Mr. Favela was kidnapped, time and location." The police also made that same

determination with Watts's phone. Asked whether "[o]nce the FBI had identified this pattern and the location of the (312) 287-5361 phone, was a plan made to act on that information?" Swiderek testified "the plan was the phone was—the subscriber information for the [312] phone was to a Mr. Jeremy Borders, and the FBI's information was to an address of 503 North LeClaire on the second floor." Swiderek along with Chicago police detective Patrick Deenihan and "several other members" of the CPD and FBI went to that location. Borders's name was on the mailbox or the bell on the second floor. The main entrance to the building was open, so the police went to the second floor, which had only one unit, and announced their office. No one answered the door. The door was closed and unlocked, so the officers opened the door and walked in. Borders was alone on the sofa near the front door and there was a cell phone "in the immediate area of" him, "I believe on the floor." FBI Agent Sean Burke picked up the phone and asked Borders if it belonged to him, and Borders admitted it was his phone. Burke called that number, and Burke's number showed up on the caller ID of that phone. Swiderek also testified that when the police first entered Borders's apartment, they first looked for Favela and did not find him, after which the police continued to search the apartment. The police found duct tape and a letter with Watts's name on it. Borders was kept at the apartment for about one hour.

¶ 14       On cross-examination, Swiderek stated that the two calls that he had previously testified about that were made to Favela's phone, and the call that was made to Favela's wife's phone after the kidnapping, were not made from the 312 phone associated with Borders. He testified that he and his police officers met with the FBI before they went to Borders's residence, and the "FBI agents, told us that the phone—I can't say the word—subscriber information came to 503 Leclaire on the second floor of Jeremy Borders," which was information that the FBI provided to him. Asked whether he was told by someone from the FBI that the 312 phone was

"tied to Jeremy Borders and that he was the subscriber to that number," he answered, "[t]hat's correct." The address associated with that account was the 503 North LeClaire address. When Swiderek went to Borders's apartment, he was with Chicago police detective Deenihan, four other CPD officers, and six FBI agents, for a total of 12 officers. The officers did not ring the doorbell to Borders's unit before proceeding to the stairwell to the second floor. They said "police" a "couple" of times and then entered the apartment. The police did not have a search warrant for his apartment nor an arrest or search warrant for his person. When the police entered the apartment, Borders was sitting on the sofa. Borders was not breaking any laws at the time, and was immediately placed under arrest. He was handcuffed and not free to leave. The parties stipulated that when Swiderek testified at Watts's trial on January 13, 2014, he testified that "while [Borders] was being detained, one of the officers or FBI agents, *** they handcuffed him, they went through his pockets, his pants pockets, found a phone, handed it to me." Swiderek also testified that the document with Watts's name that was recovered also had the name of Borders's uncle on it.

¶ 15　　In closing, defense counsel argued that there was no probable cause, and it was uncontested that there was no warrant for Borders's arrest. Counsel argued that Borders did not give consent to the CPD or FBI to enter his residence, and at the time the officers entered, he was not committing any crimes. Counsel asserted that Swiderek testified that the two calls made to Favela before the incident and the ransom call made to Favela's wife were not made from Borders's phone. Counsel stated that Swiderek testified that based on "some cell phone technology," Borders's cell phone was in the "area of where this transpired, but that is not something that can be pinpointed to that specific address." Defense counsel argued that basically

anyone within the circumference of the relevant cell phone towers could be a suspect, which was not reasonable.

¶ 16       In response, the State argued that when the police entered Borders's home, Favela was still missing, they were looking for anything that could help find him, and they were in an "emergency situation." The State argued that the police worked on a phone pattern "not because of calls Borders has placed to Favela, but because of the ongoing calls between Stokes, Borders and Watts." The police saw a "pattern develop between the Borders's phone and Stokes['] and Watts' phone[s]," and Borders was "at the location of the kidnapping at the time and place of the kidnapping."

¶ 17       In reply, defense counsel noted that most of the evidence and arguments presented were about Stokes and Watts. Defense counsel stated that at the time the police entered Borders's apartment, they only knew that he lived there, his phone had been in the area, and his phone had been in contact with one or both of the codefendants. Anyone on the list of phone records related to Watts and Stokes would possibly be involved in the kidnapping.

¶ 18       The court denied Borders's motion to quash arrest and suppress evidence and found there was probable cause to arrest him. The court noted that it was an "emergency situation," "the time for the ransom to be paid had expired," the "kidnapped victim, Mr. Favela had not been located," and "[t]wo persons had already been taken into custody." The trial court then stated that "[t]heir phone numbers, the three of them, including Borders, the other two persons, their phone numbers at the time of this kidnapping and this battery of the other gentleman, all of them were tied in about the same time of this offense." The court concluded, "I believe it was stated that Mr. Borders—that his phone number was on the premises, was at that location, had been tracked by technology to being on the scene of the kidnapping." The court then stated, "Now

they have developed information from the other two and the tie-in with the other two persons, and this is as if defendant here, Mr. Borders, is in—they are in hot pursuit of this defendant right to his location, this emergency situation trying to locate that victim." The court further concluded that "under the circumstances it was lawful, being at his arrest, being at his place of address, that his number, that it had tied to the time of the offense, is in the very address where Mr. Borders is located. It is as if they were in hot pursuit of him from all that they had learned about his involvement in this offense."

¶ 19                              Motion to Suppress Statements

¶ 20      Before trial, Borders also filed a motion to suppress statements, in which he requested the court suppress all statements made by him because he was not given his *Miranda* rights before being interrogated by law enforcement officials. He asserted that he continued to be interrogated even after he invoked his right to consult with a lawyer. Borders also argued that he was interrogated in violation of Section 103-2.1(b)(1) of the Code of Criminal Procedure of 1963 (725 ILCS 5/103-2.1(b)(1) (West 2010)) because he was initially interrogated without electronic recording.

¶ 21      At a court date before trial, the State informed the court it was not going to use any statements that were obtained before the electronic recording device was turned on. On the day of trial, defense counsel informed the court that Borders was withdrawing the motion to suppress statements, noting that the State would not be using the electronically recorded statement unless Borders testified.

¶ 22                                       Trial

¶ 23      As previously noted, the trial judge who presided over the trial was different from the judge who presided over the motion on the hearing to quash arrest and suppress evidence. At

9

trial, the State proceeded on one count of first degree murder in that, without lawful justification, Borders killed Favela during the commission of a forcible felony, the kidnapping of Favela (720 ILCS 5/9-1(a)(3) (West 2010)). The State nol-prossed all other charges.

¶ 24        Favela's wife, Estella Favela, testified that on December 11, 2010, she received a call from her sister, who was very upset, after which Estella went to the police station with her son, Frankie.[3] On the way to the station, Estella, who did not speak English, received a call from a man, and she gave the phone to her son. Frankie spoke with the person and returned the phone to her. At that point, Favela was on the phone and said, "I'm okay," and then hung up. Frankie testified that on December 11, 2010, he was with his mother when she received a call, after which she became anxious, and they went to the police station. On the way, she received another phone call and gave the phone to him. The caller ID showed Favela's phone number, and a man told him he wanted $500,000 in two hours. The person immediately put Favela on the phone. Frankie passed the phone to his mother and heard Favela say, "I'm fine."

¶ 25        Robles testified that on December 11, 2010, he was working with Favela to remodel an apartment located at 2237 South Keeler in Chicago (Keeler location). At about 1 p.m., Favela called Robles from a store and informed him that someone was stopping by to see the apartment. At about 2 p.m., Robles was working in the kitchen pantry when Favela returned. Robles heard Favela receive a phone call, after which Favela opened the front door. Robles heard about three male voices and one female voice. Favela said in a scared voice, "[H]ey, hey, hey." Robles testified that "it seem[ed] like they started attacking him." Robles tried to get up but was hit in the back of his head with a gun and kicked in his ribs. Robles did not see what hit him and assumed it was a gun. A man then tied Robles's hands, mouth, and feet with duct tape. Robles

---

[3] Estella and Frankie share the same last name as Favela, so we will refer to them by their first names.

heard someone ask Favela for "$50,000," and Favela responded that "if he could give him $1,000, to go to the bank with him." The person responded, "[D]o you think I'm stupid" and stated that he wanted $500,000.

¶ 26       After Robles testified that he did not see the man who was in the kitchen pantry in court, the State asked Robles to look around the whole courtroom and gave him permission to walk to the well of the courtroom. Robles then identified Borders in court and stated, "I think it's him, but he's shaved. He is shaven today. That's him." The State then asked Robles what was different from the day he first saw Borders on December 11, 2010, and Robles responded, "There's a big difference because he doesn't have any hair." Robles never saw Borders with Favela. Robles testified that Borders hit him in the head with a gun, kicked him, and dragged him from the kitchen to the bathroom tub. Robles kept his knees and head down and "could hear that he was jumping from the tub to the hallway." Asked how he could tell, Robles responded that he "could hear it" and could see the light from the gun that Borders had, which he first saw when he was in the panty. For about 20 or 40 minutes, Robles heard "a lot of noises," "hitting," and moaning from Favela. At some point, the noises stopped, and Robles was able to free himself. He went to Favela's brother-in-law's house about six blocks away and then to the police station. He learned a few days later that Favela had been found and "within a day or so," Robles returned to the police station and identified Borders in a lineup. He told the police how he recognized Borders and told them what he had done.

¶ 27       Stokes's nephew, Stidwell, testified that in December 2010, Stokes was living with his aunt in Indiana. On December 11, 2010, Stidwell planned to attend a birthday party in Hammond, Indiana at Stokes's residence. Stokes picked up Stidwell in Chicago and drove him to the party. On the way, Stokes threw a set of keys out the window on Lavergne Avenue, and

while on the Dan Ryan Expressway, he took his shoes off and threw them out the window. When they arrived in Hammond, Stokes walked in the snow barefoot to the house, after which he put his clothes on the grill and set them on fire. In the early morning hours of December 12, 2010, police officers and FBI agents searched the house. Stokes was placed in custody, and Stidwell went to the police station for questioning. On cross-examination, Stidwell stated that when he was in the car with Stokes, he did not see Stokes throw the back of a cell phone out the window. He did not remember whether he had previously testified at the grand jury proceeding on December 14, 2010, that when he got in the car with Stokes, as soon as they pulled off and were driving for 30 seconds, Stokes threw some keys and the back to a cell phone out of the window.

¶ 28      Chicago police sergeant David Grant and detective James DeCicco testified that during the investigation, they recovered a set of keys near 1007 North Lavergne from underneath a parked car. DeCicco met a lieutenant at 2 a.m. on December 14, 2010, on the Dan Ryan Expressway, where two matching shoes were recovered from the shoulder. Chicago police officers testified about the various pieces of evidence found in the Keeler location, including blood, duct tape, and bloody footwear impressions.

¶ 29      Swiderek testified that on December 11, 2010, the investigation involved obtaining the phone records and "mudds and tolls" for Favela's phone, including incoming and outgoing calls and the duration of the calls. He testified when a cell phone is used, "it hits off the closest tower," which can determine the location of the phone. A "pattern relative to phone numbers" was developed and the FBI, who had the proper technology and equipment, assisted the investigation. One of the phone numbers that "developed in this phone pattern" was the 219 phone that was associated with Hammond, Indiana. The 219 phone had been in contact with Favela's phone and was pinging or "hitting off of" a cell tower in Hammond. Swiderek went to

that address in Hammond, and Stokes, who had the 219 phone in his pocket, was standing in front of the house with Stidwell. Stokes was detained and Stokes and Stidwell were transported to the police station.

¶ 30    Swiderek also testified that the FBI "was also pinging the 773 phone that had been developed in this phone pattern," and "pinging the phone" led to an address on West 19th Street, where Watts was later arrested. Swiderek testified that during the investigation, another phone number "had been developed in this phone pattern." He testified that the FBI informed Detective Donald Hill that the 312 phone "was in contact with the other two phones, and had also pinged in the vicinity of the suspected kidnapping," with the other two phones being the 219 and 773 phones. An FBI agent told his team "that the 312 number came back to a Mr. Jeremy Porters [*sic*] at 503 North LeClaire on the second floor." The agent also said "[t]hat phone had been in contact with the 219 phone that Mr. Stokes was using; and the 773 number that Mr. Watts was using." Also, the "phone pinged off a cell tower, near the area of the suspected kidnapping, when the suspected kidnapping occurred."

¶ 31    Swiderek testified that he went with FBI agents and other police officers to 503 North LeClaire. The second floor apartment door was shut, and FBI Agent Sean Burke announced "police" several times. There was no answer, after which the FBI agents opened the unlocked door and "we all ran in." Borders was on a couch in the front room and was detained by FBI agents. Once Borders was detained, Swiderek started looking for Favela. Burke recovered a cell phone "from the area or from Mr.—Mr. Borders. I can't recall exactly where." Burke asked Borders whether the phone was his, and Borders said it was. Borders stated his number was 312-287-5361. Burke called that number and Burke's number showed up on the phone. Swiderek also recovered duct tape and a letter giving power of attorney to Watts over Hassan Borders's vehicle.

At that time, Watts was in custody. Borders was kept at the apartment for about one hour before being transported to the police station.

¶ 32　　　On cross-examination, Swiderek testified that the 312 phone number never made a call to Favela's phone. There were six Chicago police officers and six FBI agents who went to Borders's residence. When Swiderek walked in, Borders was on the sofa alone in the living room. Counsel then asked, "At that point in time, Mr. Borders was placed under arrest?" and he responded, "He was—he was—excuse me, he was detained. He was not free to leave." Asked whether it was fair to say that Borders "was not free to leave, detained, arrested immediately upon you and your fellow Officers gaining entry to his apartment?" Swiderek responded, "I think it would be fair to say, he was detained, and then placed under arrest after we determined that the phone was in fact his." Swiderek acknowledged that when he previously testified at a hearing on this case on April 28, 2015, he had testified that Borders was immediately placed under arrest. Swiderek admitted that the duct tape recovered from Borders's apartment did not have blood on it, and the piece of paper with Watts's name on it was a document related to a vehicle that belonged to Hassan Borders.

¶ 33　　　Hill testified that on December 11, 2010, he reviewed Favela's phone records and developed an interest in the 219 phone because Robles had informed another detective that a potential renter had contacted Favela at the time of the kidnapping. The 219 phone used star 67 to block the number from showing up on Favela's phone, but the number still appeared in the phone records. The FBI "[pinged]" the 219 phone to determine the closest tower the phone was "hitting off," and it was located in Hammond, Indiana. In reviewing the 219 phone records, he developed an interest in the 773 phone, which had been located at an address on 19th Street in

Chicago. Hill went to that address and found Watts inside the apartment. The 773 phone was recovered from the back bedroom, and a loaded handgun was found in the bathroom.

¶ 34   On cross-examination, Hill testified that Stokes owned the 219 phone, which was the number that showed up in Favela's phone records. The 312 phone associated with Borders did not appear in Favela's phone records, and he did not call Favela. On December 11, 2010, there were nine calls made between Borders and Watts at various times throughout the day, and there were no calls between Borders and Stokes. There were 50 calls between Stokes and Watts that day. Hill testified that the kidnapping took place between 1:45 p.m. and 2:45 p.m. On that day, the phone records showed phone calls between Borders and Watts at 1:22 a.m., 10:16 a.m., 11:34 a.m., 12:41 p.m., 12:49 p.m., 1:44 p.m. 1:47 p.m., 3:51 p.m., and 4:23 p.m. On re-cross, Hill testified that Watts's phone records showed that "there were a lot of other numbers that were going back and forth with Watts's number" during that timeframe.

¶ 35   Forensic investigator David Ryan testified that a search warrant had been obtained for Watts's residence on West 19th Street. There, the washing machine had shoes in it and was filled with water that had a "reddish" color. He recovered two loaded handguns, a "slightly bloodstained" roll of duct tape, a sweatshirt with blood stains, and a receipt with Favela's name on it.

¶ 36   Chicago police officer Joseph Lopez testified that he was present when the FBI revealed that "another phone had been located as part of this investigation into the phones on the case." The FBI determined that this phone was located at 503 North LeClaire, in Chicago. The CPD and FBI went to that location and entered the second floor apartment. Swiderek arrested defendant. The officers did not have a conversation with Borders about Favela before he was arrested.

¶ 37    Lopez and his two other partners were directed to transport Borders to the police station. Officer Todd Mueller was the driver, Lopez sat in the front seat, and Borders sat in the back seat next to Officer Will Johnson. On the way, Borders said, "I'm going to tell you where the victim's at." No one had asked Borders about the location of the victim before he made the statement. Lopez alerted another detective through radio transmission about Borders's statement. Lopez testified that when they were driving, Borders "gave us a location, an area first of where the victim was going to be at," which was the "Augusta and Springfield area." Mueller began driving in that direction and Borders directed their path and told them they were looking for a garage. Borders directed the officers to an alley at 1100 North Springfield Avenue, and then directed them to stop by a garage located at 1136 North Springfield Avenue (Springfield Avenue location). Lopez testified that Borders said, "it's the red garage, red door." It was about a 15 to 20 minute drive from Borders's home to the Springfield Avenue location, and Borders directed the officers the entire time. The officers found Favela's deceased body in the back of a car in the garage.

¶ 38    FBI Agent Joseph Raschke, a member of the FBI's cellular analysis survey team (CAST), qualified as an expert in cell site analysis. As part of a cellular phone investigation, the phone company provides a spreadsheet, which contains information about the date and time of the call, the numbers involved, the duration, and which cell towers were utilized. Raschke uses that information and depicts on a map where and when the cell towers were being utilized. A phone usually uses the closest tower and the one with the best signal, though that is not always the case, as there are obstructions that could affect it. He testified that "nothing about this and nothing you will hear me say today puts a phone at a specific address."

¶ 39        Raschke testified that he analyzed the phone records of Stokes, Watts, and Borders. He presented a PowerPoint presentation showing the activity of each phone on the day of the incident. Raschke testified that for Borders's phone, "[t]here wasn't as much activity on this phone as we've seen on some of the other phones." Borders's phone showed activity between 10 a.m. and 12:30 p.m. on three different towers north of the Keeler location and south of the Springfield Avenue location. At 12:49 p.m., 1:44 p.m., and 1:46 p.m., there was activity on the tower "near the Keeler location." At 2:14 p.m. and 2:15 p.m., there was activity "down on the tower near the Keeler location." At 3:51 p.m., there was activity "on the tower south of the Springfield location, so movement by the phone north from the previous location during that time period." Between 5 p.m. and 8:05 p.m., there were five calls made using three different towers and then no activity until about 8:04 p.m. "south and east" of the Springfield Avenue and Keeler locations. On cross-examination, Raschke testified he could not determine whether the towers that were being used by the phones were the closest towers. He could not pinpoint where Borders's phone was located at any given time, and he was giving a general area based on the location of the cell towers. Raschke offered additional testimony on the activity that occurred on the phones of Watts and Stokes on the day of the incident.

¶ 40        Forensic scientist Ryan Paulson, who qualified as an expert in forensic biology and forensic DNA analysis, testified that he tested 23 different pieces of evidence and generated a DNA profile for Borders. Among the many items tested included a steering wheel, Favela's fingernails, and blood stains from various recovered items. The DNA profile on the items did not match Borders.

¶ 41        Forensic investigator Zbigniew Niewdach testified that he went to the garage at 1136 North Springfield Avenue, where he saw a vehicle with a deceased man in the back. At the

scene, he found two latex gloves, a city of Chicago garbage can with the address 2240 South Keeler, and an electric cord tied to the front handle of the garbage can. He observed that electric portions were removed from the overhead garage door to render it inoperable, and the metal "draw bar arm" attached to the garage door and mechanism that opens the door had been disconnected. He took DNA swabs from the garage's service door and steering wheel of the vehicle.

¶ 42    Dr. Steven White, a forensic pathologist who performed an autopsy on Favela, testified that it was his opinion that the manner of death was homicide.

¶ 43    The State introduced several stipulations entered between the parties, which included that the keeper of the records from Sprint Nextel would have testified that the records for the phone numbers 773-225-1994, 219-433-2728, and 312-287-5361 were true and accurate and kept in the regular course of business and "there was no subscriber information attached to those numbers."

¶ 44    Defense counsel presented a stipulation that an assistant state's attorney would have testified that on December 14, 2010, when Stidwell testified at a grand jury proceeding, he testified that about 30 seconds after he got in Stokes's car, Stokes threw keys and the back to a cell phone out of the window.

¶ 45    Following closing arguments, the jury found Borders guilty of first degree murder. Borders filed a motion and amended motion for a new trial, in which he asserted that the court erred when it denied his pretrial motions. The trial court sentenced Borders to 55 years in prison. The court denied Borders's motion to reconsider sentence. This appeal follows.

¶ 46                              II. ARGUMENT

¶ 47       On appeal, Borders contends that the trial court erred when it denied his motion to quash arrest and suppress evidence because the State failed to establish probable cause and he was arrested without a warrant. He argues that all the evidence recovered as a result should be suppressed, including all statements he made before he arrived at the police station, the evidence recovered from his apartment, and Robles's lineup identification of him.

¶ 48       When we review a trial court's ruling on a motion to suppress evidence, we apply a two-part standard of review. *People v. Craine*, 2020 IL App (1st) 163403, ¶ 27. Under this standard, we will  defer to the trial court's factual findings and disregard those findings only where they are against the manifest weight of the evidence. *People v. Johnson*, 237 Ill. 2d 81, 88 (2010). However, we review *de novo* the trial court's "ultimate ruling as to whether suppression is warranted." *Craine*, 2020 IL App (1st) 163403, ¶ 27. The burden of proof is on the defendant when he files a motion to suppress evidence. *People v. Brooks*, 2017 IL 121413, ¶ 22. "If the defendant makes a *prima facie* showing that the evidence was obtained in an illegal search or seizure, the burden shifts to the State to provide evidence to counter the defendant's *prima facie* case." *People v. Cregan*, 2014 IL 113600, ¶ 23. However, "the ultimate burden of proof remains with the defendant." *Id.* Further, "[w]hen reviewing a lower court's ruling following a suppression hearing, the appellate court may consider both the evidence produced at the hearing and the evidence presented at the subsequent trial." *In re K.M.,* 2019 IL App (1st) 172322, ¶ 18.

¶ 49       The fourth amendment of the United States Constitution and article I, section 6, of the Illinois Constitution guarantee citizens the right to be free from unreasonable searches and seizures. U.S. Const., amend. IV; Const. 1970, art. I, § 6; *People v. Williams*, 2020 IL App (3d) 180024, ¶ 30. The "essential purpose" of the fourth amendment is to establish a standard of "reasonableness" on the exercise of discretion by government and law enforcement officers " 'to

safeguard the privacy and security of individuals against arbitrary invasions.' " (Internal quotation marks omitted.) *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979) (quoting *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967))). The reasonableness requirement under the fourth amendment "generally requires a warrant supported by probable cause." *People v. Thornton*, 2020 IL App (1st) 170753, ¶ 25. Thus, "the police need either a warrant or probable cause coupled with exigent circumstances to lawfully enter a private residence and effectuate an arrest." *People v. Shanklin*, 367 Ill. App. 3d 569, 574 (2006). An arrest made without probable cause violates the prohibition against unreasonable searches and seizures set forth in the United States and Illinois constitutions. *People v. Bloxton*, 2020 IL App (1st) 181216, ¶ 18.

¶ 50       As an initial matter, we must determine whether Borders was arrested when the officers entered his apartment. "To determine whether an individual has been unlawfully seized, the relevant inquiry is whether a reasonable person, innocent of any crime, would conclude that he was not free to leave under the circumstances." *People v. Soto*, 2017 IL App (1st) 140893, ¶ 49. Here, the record shows that Borders was immediately detained and arrested when the officers entered his apartment. At the suppression hearing, Swiderek testified that there were a total of 12 officers and FBI agents who went to Borders's apartment. The officers announced their office and opened the door to his apartment, and Borders was sitting on the couch and not doing anything wrong. Swiderek testified that Borders was immediately arrested, handcuffed, and not free to leave. Under these circumstances, a reasonable person would conclude that he was not free to leave. Borders was immediately placed under arrest when the officers entered his apartment. See *People v. Vasquez*, 388 Ill. App. 3d 532, 549 (2009) ("A person is arrested when his freedom of movement is restrained by physical force or a show of authority."). The parties do

not dispute that the police did not have a warrant to enter Borders's apartment and arrest him. Thus, the officers needed probable cause coupled with exigent circumstances to enter and arrest him.

¶ 51                                              Probable Cause

¶ 52        "Probable cause exists where the facts and circumstances, considered as a whole, are sufficient to justify a belief by a reasonably cautious person that the defendant is or has been involved in a crime." *Thornton*, 2020 IL App (1st) 170753, ¶ 25. "The substance of all of the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized." *People v. Jones*, 215 Ill. 2d 261, 274 (2005). "Where the standard is probable cause, a search or seizure of the person must be supported by probable cause particularized with respect to that person, and this requirement cannot be undercut or avoided simply by showing that there exits probable cause to search or seize another person who is nearby." *People v. Drake*, 288 Ill. App. 3d 963, 964 (1997). Further, a police officer's determination of whether probable cause exists focuses on the facts known to the police at the time of the arrest (*Bloxton,* 2020 IL App (1st) 181216, ¶ 18) and is "an objective determination that must be made on a case-by-case basis and depends upon the totality of the circumstances at the time of the arrest" (*Craine*, 2020 IL App (1st) 163403, ¶ 29).

¶ 53        The facts and circumstances known to the officers at the time of Borders's arrest were not sufficient to justify to a reasonably cautious person that Borders had committed or was committing a crime. At the suppression hearing, Swiderek testified about the facts the officers knew before the 12 officers and FBI agents entered Borders's home and arrested him. The FBI developed the 312 phone in the "phone pattern between Stokes'[s] phone and Watts'[s] phone," and "through the use of the phone technology on the phone," the officers learned that the 312

phone was "in the vicinity of the kidnapping, at the time Mr. Favela was kidnapped, time and location." Swiderek also testified that the "subscriber information for the [312] phone was to a Mr. Jeremy Borders, and the FBI's information was to an address of 503 North LeClaire on the second floor."

¶ 54    As previously noted, for probable cause to exist, the officers' "belief of guilt must be particularized with respect to the person to be searched or seized" (*Jones*, 215 Ill. 2d at 274) and "the officer[s] must reasonably believe that a crime occurred *and that the defendant committed it*" (emphasis in original) (*Craine*, 2020 IL App (1st) 163403, ¶ 32). Although Swiderek testified at the suppression hearing that the FBI developed the 312 phone in "this phone pattern between Stokes'[s] phone and Watts'[s] phone," he did not explain the pattern or how the 312 phone was connected to any phone patterns with the phones of Stokes, Favela, and Watts. As for Stokes's and Watts's phones, Swiderek testified that Stokes's phone called Favela and Favela's wife and that Stokes's phone "would call the victim's phone and then call—I don't remember the exact order, but then call Mr. Watt's[s] phone or Mr. Watts would then call Mr. Stokes after the victim was spoken with." He also agreed with the State's question that "there would be phone calls inbetween [*sic*]  Stokes'[s] phone, Watts'[s] phone, and the victim's phone." However, as for the 312 phone, Swiderek testified that the calls made to Favela's phone and to Favela's wife's phone were not made from the 312 phone and he did not explain how the 312 phone was connected to or in a pattern with any other phones.

¶ 55    In addition, Swiderek's testimony at the suppression hearing that the 312 phone was "in the vicinity of the kidnapping" was insufficient to establish probable cause, as "it is well settled that an individual's presence in an area of expected criminal activity, standing alone, is insufficient to establish probable cause." *Id*. Further, Swiderek testified at the suppression

hearing that "subscriber information for the [312] phone was to a Mr. Jeremy Borders, and the FBI's information was to an address of 503 North LeClaire on the second floor." However, where there was no testimony showing how the 312 phone was connected to the other phones or showing of how Borders, in particular, was tied to the 312 phone more than just being the subscriber, we cannot find that the testimony relating to Borders being the subscriber for the 312 phone was sufficient to show that at the time the officers entered Borders's apartment, they reasonably believed that Borders had committed a crime.

¶ 56    Also, we note that Swiderek's testimony at the suppression hearing about Borders being the subscriber to the 312 phone was inconsistent with the evidence at trial. At trial, the parties entered a stipulation that the keeper of the records from the phone company would have testified that there was no subscriber information attached to the 312 phone. For this additional reason, Swiderek's testimony at the suppression hearing relating to Borders being the subscriber for the 312 phone was questionable to support a finding that Borders, in particular, was tied to the 312 phone. We also note that, at trial, Detective Hill testified that on the date of the incident, there were nine calls between Watts and Borders, and no calls between Borders and Stokes. There were 50 calls between Stokes and Watts.

¶ 57    In addition, when the trial court denied Borders's motion, it stated that all three phone numbers were "tied in about the same time of this offense" and "I believe it was stated that Mr. Borders—that his phone number was on the premises, was at that location, had been tracked by technology to being on the scene of the kidnapping." However, Swiderek testified that the officers discovered that the 312 phone was "in the vicinity of the kidnapping at the time Mr. Favela was kidnapped, time and location" and never testified that his phone was on the premises or at the location of the kidnapping. And, as previously noted, there was no testimony about how

23

Borders's phone fit into any "pattern" with the phones of Stokes, Watts, or Favela. Thus, the trial court's findings that Borders was "tied" to the other phones and that his phone was at the location of the incident are against the manifest weight of the evidence.

¶ 58    Based on this record, we cannot find that the facts and circumstances as a whole are sufficient to justify a reasonable belief that Borders had committed or was involved in a crime when the officers entered his apartment and immediately arrested him. Thus, the trial court erred in denying Borders's motion to quash arrest and suppress where the officers did not have probable cause to enter his apartment and immediately arrest him. We reverse the trial court's ruling that denied Borders's motion to quash arrest and suppress evidence.

¶ 59    Given our disposition that the police did not have probable cause, we need not analyze the parties' arguments regarding whether exigent circumstances existed, as the police needed both probable cause and exigent circumstances to lawfully enter Borders's residence and arrest him. See *People v. Foskey*, 136 Ill. 2d 66, 75-76 (1990) (the police need probable cause and exigent circumstances to enter a home and arrest without a warrant, noting that "[t]hat probable cause existed, however, is not alone sufficient to justify a warrantless entry into a suspect's home to effect an arrest"); see also *Shanklin*, 367 Ill. App. 3d at 574 ("the police need either a warrant or probable cause coupled with exigent circumstances to lawfully enter a private residence and effectuate an arrest").

¶ 60                    Suppression of Evidence

¶ 61    Borders next argues that the court should suppress certain statements and evidence. We first consider his argument that his admission that the phone belonging to him should be suppressed because it was the result of a custodial interrogation in violation of *Miranda*. The

State does not dispute that Borders was not given *Miranda* warnings when the officers entered his apartment.

¶ 62    Under the fifth amendment to the United States Constitution, no person " 'shall be compelled in any criminal case to be a witness against himself.' " *People v. Martin*, 2020 IL App (1st) 181217, ¶ 14 (quoting U.S. Const., amend. V). "To safeguard this right, any person subjected to custodial interrogation 'must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' " *Martin*, 2020 IL App (1st) 181217, ¶ 14 (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). When an individual is subject to a custodial interrogation without the benefit of *Miranda* warnings, the State may not use that person's inculpatory or exculpatory statements at trial. *People v. Garza*, 2018 IL App (3d) 170525, ¶ 12.

¶ 63    Under *Miranda,* "custodial interrogation" means " 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *Id.* ¶ 13 (quoting *Miranda*, 384 U.S. at 444). There are two elements: "(1) whether an individual was subject to interrogation and (2) whether the interrogation occurred in a custodial situation." *Id.*

¶ 64    As for the first element, an "interrogation" is considered "any practice that police should know is reasonably likely to evoke an incriminating response from a suspect." *People v. Tayborn*, 2016 IL App (3d) 130594, ¶ 18. In *Miranda*, the Supreme Court noted that "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding." *Garza*, 2018 IL App (3d) 170525, ¶ 15 (quoting *Miranda*, 384 U.S. at 477-78). "The '[g]eneral on-the-scene questioning' exception

will apply only when police pose general questions in a noncustodial environment to nonsuspects regarding the facts that surround a crime." *Id.*

¶ 65     As for whether a person is "in custody" for purposes of *Miranda*, "a court examines the circumstances surrounding the interrogation to determine whether, given those circumstances, a reasonable person, innocent of any crime, would have felt that he was not at liberty to terminate the interrogation and leave." *Tayborn*, 2016 IL App (3d) 130594, ¶ 19. Factors that are determinative regarding whether a person is considered to be in a custodial setting include "the location, time, length, mood, and mode of interrogation; the number of police officers present; the presence or absence of the family and friends of the accused; any indication of formal arrest; and the age, intelligence, and mental makeup of the accused." *Garza*, 2018 IL App (3d) 170525, ¶ 16.

¶ 66     Here, Borders's admission that the phone belonged to him was the result of a custodial interrogation. The question about whether the phone belonged to Borders was intended to elicit an incriminating response. At the time the officers entered Borders's apartment without a warrant, the officers were using phone technology with the help of the FBI, and the investigation had focused on phone records to identify and locate the suspects. The officers were specifically looking for the 312 phone that was in a "phone pattern between Stokes'[s] phone and Watts'[s] phone." Under these circumstances, which involved the presence of 12 officers, the question to Borders about the ownership of the phone found next to him was reasonably likely to elicit an incriminating response from him. See *id.* ¶ 15 (finding that the "general on-the-scene questioning" exception did not apply, noting that the defendant "was subject to the compelling pressures of police custody"); see also *People v. Fort*, 2014 IL App (1st) 120037, ¶ 17 ("a question at the scene counts as impermissible interrogation if it is reasonably likely to elicit an

incriminating response"); *People v. Barnett,* 393 Ill. App. 3d 556, 559 (2009) (where the defendant was arrested for being intoxicated and then was asked by an officer whom the vehicle belonged to and if it should be towed, the questions were likely to produce an incriminating response because the officer knew the answer to the question and the ownership question had been previously answered by the officer's computer check of the vehicle's registration number).

¶ 67　　　　Further, as previously discussed, the record shows that Borders was placed under arrest when the officers entered his apartment. Swiderek testified at the suppression hearing that there were 12 officers and FBI agents who entered Borders's apartment without a warrant. When they entered his apartment, he was on the couch and was "immediately" arrested, handcuffed, and not free to leave. There was a cell phone in Borders's "immediate area," and FBI Agent Burke asked him if it belonged to him. Borders then admitted it was his phone. At trial, Swiderek similarly testified that Borders was immediately detained and not free to leave after the officers entered his apartment, as he testified that the FBI agents opened the door and "we all ran in." After Swiderek entered the apartment, Borders was on the couch being detained and handcuffed by FBI agents. See *Garza*, 2018 IL App (3d) 170525, ¶ 18 (the defendant was not free to leave, where the police presence grew to outnumber the other people present and "their overwhelming presence would cause a reasonable person to question their ability to merely walk away without permission"). Thus, under these circumstances, we find that no reasonable person would have felt free to leave or refuse to answer the question about whether the phone belonged to him. Borders was in a custodial situation when he was asked whether the 312 phone belonged to him. Accordingly, Borders's statement that the phone belonged to him was the product of custodial interrogation and in violation of *Miranda*. The trial court should have suppressed Borders's response that the 312 phone belonged to him.

¶ 68 The State contends that the failure to provide Borders with *Miranda* warnings before asking if the phone belonged to him was excused by the rescue doctrine. It argues that the circumstances of the case, which involved the rescue of a known individual where time was of the essence, were sufficiently exigent to place the initial questioning outside the scope of *Miranda*. However, the State also acknowledges that the rescue doctrine "has yet to be recognized or applied in Illinois." We decline to apply the rescue doctrine where we have no authority to do so. See *People v. Laliberte*, 246 Ill. App. 3d 159, 164 (1993) (where the State requested the court to recognize the validity of the rescue doctrine, the court declined to recognize the exception).

¶ 69 Borders next argues that the court should suppress all statements and evidence obtained as a result of his illegal arrest, including the evidence found at this apartment, his admission that he owned the 312 phone, his statements that he would show the police where the body was located, physical evidence recovered from the Springfield Avenue location, and Robles's lineup identification of him. Borders argues that his statements that led to both Favela's body and the physical evidence recovered from the garage at the Springfield Avenue location as a result of his statements were inadmissible because the statements were not attenuated from Borders's admission regarding ownership of the 312 phone. As for Robles's lineup identification of Borders, he asserts that it should be suppressed because it was obtained as a result of his warrantless arrest.

¶ 70 Under the exclusionary rule, evidence obtained by law enforcement in violation of the fourth amendment cannot be admitted into evidence. *In re K.M.*, 2019 IL App (1st) 172322, ¶ 35. An outgrowth of the exclusionary rule is the fruit of the poisonous tree doctrine, under which a violation of the fourth amendment is deemed the "poisonous tree," "and any evidence obtained

by exploiting that violation is subject to suppression as the 'fruit' of that poisonous tree." *People v. Henderson*, 2013 IL 114040, ¶ 33. The exclusionary rule applies to physical evidence seized in an illegal search, items observed, or words overheard in the course of the unlawful activity, or admissions or statements obtained during an illegal arrest and detention. *People v. Lopez*, 2018 IL App (1st) 153331, ¶ 29.

¶ 71      Courts have recognized several exceptions to the exclusionary rule, including the attenuation doctrine. *In re K.M.,* 2019 IL App (1st) 172322, ¶ 36. Under this doctrine, "evidence challenged for a fourth amendment violation is admissible if the connection between the unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstances." *Id.* ¶ 37. " 'The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence, which often has nothing to do with a defendant's actions.' " *Id.* (quoting *Utah v. Strieff*, 579 U.S. 232, 238 (2016)). The question is whether the evidence was obtained by exploiting the illegality of the arrest. See *People v. Foskey*, 136 Ill. 2d 66, 85 (1990) (citing *Brown v. Illinois*, 422 U.S. 590, 95 (1975)). "Evidence obtained after an illegal entry need not be suppressed if such evidence was obtained by means sufficiently distinguishable to be purged of the primary taint of the illegality." (Internal quotation marks omitted.) *People v. White,* 117 Ill. 2d 194, 222 (1987) (quoting *Wong Sun v. United States,* 371 U.S. 471, 487-88 (1963)).

¶ 72      To determine whether lineup identifications and other evidence were sufficiently attenuated from the illegal arrest, we consider the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional conduct, the presence of intervening circumstances, and the purpose and flagrancy of the police officers' conduct. *In re K.M.*, 2019 IL App (1st)

172322, ¶ 37; see also *People v. Smith*, 232 Ill. App. 3d 121, 129 (1992). As for admissions, in addition to considering these three factors, we also review whether *Miranda* warnings were given. *Gutierrez*, 2019 IL App (3d) 180405, ¶ 17. Generally, two key factors in determining whether the police exploited the illegal arrest to obtain an admission from a defendant are intervening circumstances and flagrancy of police misconduct. *People v. Klimawicze*, 352 Ill. App. 3d 13, 19 (2004). It is the State's burden to prove attenuation. *People v. Jackson*, 374 Ill. App. 3d 93, 102 (2007). "The State must show by clear and convincing evidence that the challenged evidence was obtained by means sufficiently distinguishable to be purged of the primary taint." *Jackson*, 374 Ill. App. 3d at 102.

¶ 73       Here, Borders asserts that his statements leading the police to Favela's body and any physical evidence recovered from the garage at the Springfield Avenue location were inadmissible because these statements were not attenuated from his prior admission regarding ownership of the 312 phone. The State responds that Borders's statements about the location of Favela's body were admissible because they were voluntary, and Borders without prompting or questioning, told the officers that he would tell them where the victim was located. However, even if we assume that Borders's statements that led the police to the Springfield Avenue location were voluntary, an attenuation analysis would still be necessary because he was arrested without probable cause in violation of the fourth amendment. See *People v. Gempel*, 2016 IL App (3d) 140833, ¶ 89 ("where the defendant gave a voluntary statement under the fifth amendment, we conduct attenuation analysis to determine whether police obtained the statement by exploiting an illegal arrest under the fourth amendment"); see also *People v. Bowen,* 164 Ill. App. 3d 164, 176 (1987) ("Even if the statements in this case were found to be voluntary under the fifth amendment of the Federal Constitution, the fourth amendment issue remains.").

¶ 74 The State asserts in its brief that because the trial court concluded that the police had probable cause to arrest Borders, the record was not developed to answer the attenuation question, and if we determine that Borders's statements were the product of an illegal arrest, we should remand for an attenuation hearing. The State also asserts that "[i]f this Court finds that his arrest was unlawful, then the proper remedy is to remand this case for an attenuation hearing because the record was not developed for the purpose of determining whether the identification was sufficiently attenuated from the arrest." (State's Brief pg. 37). In Borders's reply brief, he states that the police lacked probable cause for his arrest and his statements were not sufficiently attenuated to be admissible, "[b]ut Borders has no quarrel with the State's assertion that if this Court finds that the statements were the result of an illegal arrest, remand for attenuation hearing would be a proper remedy." We also note that in Borders's prayer for relief, he requests, in the alternative, that we "remand for an attenuation hearing pursuant to Issue I."

¶ 75 We agree with the parties and remand this case for an attenuation hearing for the trial court to determine whether evidence obtained after the officers unlawfully arrested him—evidence in Borders's apartment, Borders's statements in the police car that led to Favela's body and the evidence in the garage at the Springfield Avenue location, and Robles's identification of him—were sufficiently attenuated to purge the taint of the unlawful arrest such that some or all of the evidence is admissible. See *People v. Schreiner*, 2021 IL App (1st) 190191, ¶ 72 (the court found that the search of the defendant's property was unreasonable, and then vacated his conviction and remanded for an attenuation hearing, noting that "there might be arguments that sufficient attenuation existed to purge the taint of the unlawful entry and render some or all of that evidence admissible," and "the State never had the opportunity to shoulder that burden to establish attenuation as to some or all of the evidence that resulted from the search"). Because

the trial court found that there was probable cause for Borders's arrest, it did not consider the attenuation issue. Neither party had the opportunity to develop the record as to the attenuation of this evidence. We remand this case for an attention hearing as to the evidence obtained after Borders's illegal arrest. See *People v. Wallace*, 299 Ill. App. 3d 9, 19, (1998) (where the reviewing court found the defendant was illegally arrested, it reversed his conviction and remanded, stating "[i]n light of its ruling on defendant's motion to quash his arrest, the trial court never considered the attenuation issue. Remandment for an attenuation hearing is appropriate where the record is not clear enough to allow a reviewing court to make an independent ruling on the matter."); see also *People v. Bates*, 218 Ill. App. 3d 288, 298 (1991) (remanding to the trial court to determine whether sufficient attenuation existed to purge the defendant's statements from the taint of his illegal arrest, noting that "the trial court was not presented with the attenuation issue").

¶ 76                                          Remaining Issues

¶ 77        The State and Borders both raise additional arguments that we do not consider at this time. The State contends that even if the trial court erred when it denied Borders's motion to quash arrest and suppress evidence, the error was harmless. Meanwhile, Borders contends that trial counsel was ineffective for failing to file a motion to quash arrest and suppress evidence based on the State's use of cellular phone data and location information that was obtained without a warrant and used to establish probable cause of his arrest and evidence of guilt at trial. Given our conclusion that the court erred when it denied Borders's motion to quash arrest and suppress evidence, and because we are remanding this cause for an attenuation hearing, we will not address these arguments.

¶ 78                                          III. CONCLUSION

¶ 79      For the foregoing reasons, we reverse the trial court's decision to deny defendant's

motion to quash arrest and suppress evidence. We reverse defendant's conviction and remand the

matter to the trial court to conduct an attenuation hearing as to the evidence obtained after the

unlawful arrest, and then, if necessary, a new trial. The trial court should have suppressed

Borders's statement that the 312 phone belonged to him because it was obtained in violation of

*Miranda*.

¶ 80      We note that in remanding this case to the trial court to hold an attenuation hearing,

we have reviewed the evidence presented, including the evidence that may be subject to

suppression, and conclude that the evidence was sufficient to support defendant's conviction. See

*People v. Schreiner,* 2021 IL App (1st) 190191, ¶ 78. Thus, double jeopardy does not serve as a

bar to a possible retrial, if necessary, following the attenuation hearing. See *id.*; see also *People*

*v. Gutierrez*, 2019 IL App (3d) 180405, ¶ 23; *People v. Hernandez*, 2017 IL App (1st) 150575,

¶¶ 150, 165.

¶ 81      Reversed and remanded with directions.

¶ 82      JUSTICE MITCHELL, specially concurring:

¶ 83      I agree with much of the majority's analysis and concur in the judgment that the

warrantless arrest of Jeremy Borders lacked probable cause. Where we part company is over the

propriety of using trial evidence to reverse a trial court's pretrial ruling in a suppression hearing

absent a defense objection at trial and the defendant having argued that new evidence to the trial

court.

¶ 84      On this question, we do not write on a clean slate. Our supreme court has held that

"[b]y not asking the court to reconsider its ruling on the motion to suppress when that evidence

was introduced at trial, defendant has waived his right to argue it on appeal." *People v. Brooks*,

187 Ill. 2d 91, 128 (1999). The court explained further: "Defendant cites no authority for the proposition that a court can consider evidence argued for the first time on appeal in considering a trial court's ruling on a motion to suppress." *Id.*

¶ 85　　The rationale for this rule is straightforward. The trial court and the State are entitled to notice in the form of a contemporaneous objection so that they have a fair opportunity to respond to the evidentiary point while the witness is still on the stand. This is particularly significant in suppression rulings, which frequently turn on a trial court's credibility finding. Indeed, in no area of the law do we permit an aggrieved party to simply lie in the weeds and then raise on appeal a point not first presented to the trial court. And yet that is precisely what the majority has permitted here by entertaining Borders's arguments related to the trial stipulation and other minor inconsistencies in the trial evidence. These arguments were never presented to the trial court, and in my judgment, are forfeited.

¶ 86　　In reaching a contrary conclusion, the majority relies on *In re K.M.,* 2019 IL App (1st) 172322, ¶ 18, which in turn relied on *People v. Kidd*, 175 Ill. 2d 1, 25 (1996). The *Brooks* court distinguished *Kidd*, noting that there, the court relied "on trial testimony to *affirm* the trial court's denial of a motion to suppress." (Emphasis in original.) *Brooks*, 187 Ill. 2d at 127 ("The reviewing court is essentially saying that whether the court's decision was supported by sufficient evidence at the suppression hearing becomes irrelevant when evidence to support the trial court's decision is introduced at trial."). It is axiomatic that a reviewing court can affirm on any basis in the record. To argue for reversal, however, *always* requires a timely objection in the trial court.

¶ 87　　Some of our decisions have reversed suppression rulings while relying on trial evidence without any explicit consideration of whether the inconsistent trial evidence was argued

first to the trial court (see, *e.g.*, *People v. Rhinehart,* 2011 IL App (1st) 100683, ¶ 9), but one published opinion (astonishingly) purports to modify the supreme court's holding in *Brooks* (*People v. Horton*, 2019 IL App (1st) 142019-B). In *Horton*, the majority eliminated the need to challenge the suppression ruling when the new evidence is introduced at trial, and instead held it is sufficient to argue the point in the posttrial motion. *Id.* ¶ 60; *contra Yakich v. Aulds*, 2019 IL 123667, ¶ 13 (quoting *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 61) (When the Illinois Supreme Court "has declared the law on any point, *it alone can overrule and modify its previous opinion*, and the lower judicial tribunals are bound by such decision and it is the duty of such lower tribunals to follow such decision in similar cases." (Emphasis in original.)). It is hard to square the *Horton* holding with time-honored decisions from our supreme court that require *both* an objection at trial and a written post-trial motion. See, *e.g.*, *People v. Mudd*, 2022 IL 126830, ¶ 21; *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).

¶ 88        Even if *Horton* could legitimately announce a new rule, the defendant's post-trial motion here was woefully inadequate to preserve a complicated evidentiary challenge potentially requiring the trial court to reweigh credibility. The posttrial motion simply stated: "That the trial court erred when it denied Defendant['s] Pre-trial Motions." That generic statement lacks the necessary specificity to put the trial court and the State on notice as to the suppression issue being renewed in light of putatively inconsistent trial evidence. See 725 ILCS 5/116-1(c) (West 2018) ("The motion for a new trial shall specify the grounds therefor."); *People v. Thomas*, 278 Ill. App. 3d 276, 283 (1996) ("[I]t is insufficient to merely refer to a cited error in a post-trial motion without factual detail.").

¶ 89        For all these reasons, I confine my analysis to the evidence introduced at the suppression hearing.